**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

CHRISTOPHER B.,

                              Plaintiff,

          v.                                                    5:21-CV-142
                                                                (DJS)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

**APPEARANCES:**                          **OF COUNSEL:**

LAW OFFICES OF KENNETH HILLER        JUSTIN M. GOLDSTEIN, ESQ.
Attorneys for Plaintiff                      KENNETH R. HILLER, ESQ.
600 North Bailey Avenue – Suite 1A
Amherst, New York 14226

U.S. SOCIAL SECURITY ADMIN.          MICHAEL L. HENRY, ESQ.
OFFICE OF REG'L GEN. COUNSEL
Attorney for Defendant
J.F.K. Federal Building - Room 625
15 New Sudbury Street
Boston, Massachusetts 02203

**DANIEL J. STEWART**
**United States Magistrate Judge**

## <u>MEMORANDUM-DECISION AND ORDER[1]</u>

          Plaintiff brought this action pursuant to 42 U.S.C. § 405(g), seeking review of a

decision by the Commissioner of Social Security that Plaintiff was not disabled for

_____

[1] Upon Plaintiff's consent, the United States' general consent, and in accordance with this District's General Order 18, this matter has been referred to the undersigned to exercise full jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  *See* Dkt. No. 4 & General Order 18.

purposes of disability insurance benefits.  Dkt. No. 1.  Currently before the Court are Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Judgment on the Pleadings.  Dkt. Nos. 14 & 15.  For the reasons set forth below, Plaintiff's Motion for Judgment on the Pleadings is granted and Defendant's Motion is denied.  The Commissioner's decision is reversed and remanded for further proceedings consistent with this decision.

## I. RELEVANT BACKGROUND

### A.  Factual Background

Plaintiff was born in 1992.  Dkt. No. 8-3, Admin. Tr. ("Tr."), p. 66.  Plaintiff reported that he completed high school with special education classes.  Tr. at p. 204.  He has past part-time work experience as a gas station attendant, cashier, and as a loader/stocker at a lumber yard.  Tr. at p. 204.  Plaintiff alleges disability due to depression, autism, diabetes, and "low vision."  Tr. at pp. 66-67.

### B.  Procedural History

Plaintiff applied for disability and disability insurance benefits under Title II in June 2018.  Tr. at p. 65.  He alleged a disability onset date of February 1, 2014.  Tr. at p. 66.  Plaintiff's application was initially denied on September 5, 2018, after which he timely requested a hearing before an Administrative Law Judge ("ALJ").  Tr. at pp. 65, 79-80.  A hearing was scheduled before ALJ Laureen Penn on April 7, 2020, which was ultimately postponed so that Plaintiff could obtain a representative.  Tr. at pp. 33-36. On July 9, 2020, a hearing was conducted before ALJ Penn at which Plaintiff and a

vocational expert testified.  Tr. at pp. 40-64.  The ALJ issued a written decision on August 27, 2020, finding Plaintiff was not disabled under the Social Security Act.  Tr. at pp. 14-27.  On December 9, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. at pp. 1-4.

### C. The ALJ's Decision

In her decision, the ALJ made the following findings of fact and conclusions of law.  First, the ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2014.  Tr. at p. 18.  The ALJ found that he had not engaged in substantial gainful activity during the period from his alleged onset date of February 1, 2014, through his date last insured of June 30, 2014.  Tr. at p. 18.  Plaintiff had worked after the alleged disability onset date, but the work activity was only part-time and therefore did not rise to the level of substantial gainful activity.  Tr. at p. 18.  Second, the ALJ found that Plaintiff had the following severe impairments: autism spectrum disorder and depression.  Tr. at p. 18.  Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings").  Tr. at pp. 19-21.  Fourth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, subject to the following non-exertional restrictions:

> [H]e could understand, remember, and carry out simple and
> routine instructions or tasks and could occasionally interact
> with supervisors, coworkers, and the public, with no direct
> customer service. He could not perform fast-paced assembly
> line type work. He could perform work that involves
> occasional decision making and occasional changes in work
> setting.

Tr. at p. 21.

Fifth, the ALJ found that Plaintiff had no past relevant work. Tr. at p. 25. Sixth, the ALJ found that Plaintiff was categorized as a "younger individual" on the date last insured. *Id.* Seventh, the ALJ found that there was work existing in significant numbers in the national economy that Plaintiff could perform. Tr. at pp. 25-26. The ALJ, therefore, concluded that Plaintiff is not disabled. Tr. at p. 26.

## II. RELEVANT LEGAL STANDARDS

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal

principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B. Standard to Determine Disability**

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

## III. ANALYSIS

Plaintiff's Memorandum of Law presents two issues for the Court's review. Plaintiff claims first that the ALJ erred in finding that Plaintiff's "uncontrolled type 1 diabetes mellitus" was not a severe impairment during the time period at issue, and improperly relied upon "a gap in the record" to find that his symptoms were nonsevere prior to his date last insured.  Dkt. No. 14, Pl.'s Mem. of Law at pp. 11-21.  Within this claim, Plaintiff also asserts that the ALJ improperly evaluated medical opinions in the record.  *Id.* at pp. 21-25.  Second, Plaintiff claims that the RFC was not supported by substantial evidence.  *Id.*  In response, Defendant asserts that Plaintiff failed to meet his burden of proving disability during the relevant time period, that the ALJ properly evaluated the medical opinions of record, and that the analysis and ultimate decision were both supported by substantial evidence.  Dkt. No. 15, Def.'s Mem. of Law at pp. 5-21.

Plaintiff alleges that the ALJ erred at step two in the sequential analysis by failing to find his diabetes to be a severe impairment.  Pl.'s Mem. of Law at pp. 11-21.  Plaintiff claims that this error occurred in large part due to the ALJ's improper reliance on a gap in the medical records.  *Id.*  Plaintiff additionally asserts that the ALJ failed to properly analyze his diabetes in combination with other impairments.  *Id.*  At step two of the sequential analysis, ALJ Penn determined that Plaintiff had two severe impairments: autism spectrum disorder and depression.  Tr. at p. 18.  Although the ALJ recognized Plaintiff's type 1 diabetes mellitus as a medically determinable impairment, she found

that it was "only a slight abnormality that would have no more than a minimal effect on [Plaintiff's] ability to meet the basic demands of work activity." Tr. at p. 18. The ALJ acknowledged that Plaintiff had "a history of juvenile or type I diabetes mellitus that had been diagnosed when he was 15 years old" but found that "there was no evidence of relevant treatment or complaints in the period at issue and this condition should be amenable to proper control by adherence to recommended medical management and medication compliance." Tr. at p. 18. ALJ Penn stated that Plaintiff "was not documented to seek medical treatment for any physical symptoms in 2014, apart from a normal chest x-ray in June 2014, and a report of an endocrinology evaluation in October or November 2014, months after his date last insured (Exs. 4F/145, 4F/154)." *Id.* As a result, the ALJ found that Plaintiff's "medically determinable impairment of diabetes mellitus [was] nonsevere throughout the period at issue," although she noted "that the claimant had more significant symptoms of his diabetes mellitus more recently, but this occurred well after his date last insured, with nothing to suggest he was having such a degree of symptoms prior to his date last insured (Exs. 8F-15F, 16F)." Tr. at p. 18.

"The claimant bears the burden of presenting evidence establishing severity" at step two. *Brandy L. v. Kijakazi*, 2022 WL 675709, at *3 (N.D.N.Y. Mar. 7, 2022) (quoting *Henry v. Astrue*, 32 F. Supp. 3d 170, 180 (N.D.N.Y. 2012)). However, this burden has been described as "minimal" and "designed to eliminate only clearly insubstantial claims." *Dawn Lyn C. v. Kijakazi*, 2021 WL 4398372, at *4 (D. Conn. Sept. 27, 2021) (quoting *Serrano v. Astrue*, 645 F. Supp. 2d 64, 66 (D. Conn. 2009));

*see also Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (holding that the analysis at step two is intended only to "screen out *de minimis* claims."); *Brandy L. v. Kijakazi*, 2022 WL 675709, at *3 (stating that "[t]he purpose of the Step Two severity analysis is to screen out only the weakest claims.") (citation omitted).  As a result, an impairment that is not severe "must be only a slight abnormality that has no more than a minimal effect on an individual's ability to perform basic work activities."  *Dawn Lyn C. v. Kijakazi*, 2021 WL 4398372, at *4.

Plaintiff has filed for Title II benefits only.  Tr. at p. 45.  His date last insured was June 30, 2014.  Tr. at p. 18.  As a result, the time period primarily at issue in this case is a very narrow window from February 1, 2014 through June 30, 2014 (the alleged date of onset through the date last insured).  Tr. at p. 16.  "Under Title II, a period of disability cannot begin after a worker's disability insured status has expired."  *Elizabeth A. o/b/o A.C.P. v. Saul*, 2021 WL 2431002, at *3 (citing *Woods v. Colvin*, 218 F. Supp. 3d 204, 207 (W.D.N.Y. Nov. 3, 2016)).  "In other words, '[i]t is well established that evidence of an impairment which reached disabling severity after the expiration of insured status, or which was exacerbated after such expiration, cannot be the basis for the determination of entitlement to a period of disability and disability insurance benefits, even though the impairment itself may have existed before the claimant's insured status expired.'"  *Elizabeth A. o/b/o A.C.P. v. Saul*, 2021 WL 2431002, at *3 (quoting *Ewing v. Astrue*, 2013 WL 1213129, at *3 (N.D.N.Y. Mar. 22, 2013)).  That does not mean, however, that evidence from outside that four-month time frame may automatically be discounted.

*See Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989).  This is because "evidence bearing upon [a plaintiff's] condition subsequent to the date upon which the earning requirement [i.e., insured status] was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present…." *Pollard v. Halter*, 377 F.3d 183, 193-94 (2d Cir. 2004) (citing *Lisa v. Secretary of Dep't of Health and Human Serv.*, 940 F.2d 40, 44 (2d Cir. 1991)).

Plaintiff asserts that it was error for the ALJ to conclude his diabetes was not a severe impairment, given his long history of poorly controlled diabetes since he was first diagnosed at the age of 15.  Pl.'s Mem. of Law at pp. 11-13.  Plaintiff alleges that he has experienced significant difficulty in managing his condition, which his treating providers opined was largely due to his comorbid mental health conditions.  *Id.* at pp. 13-15.  The ALJ did identify Plaintiff's depression and autism spectrum disorder as severe impairments but found that his diabetes was not severe.  Tr. at p. 18.

Diabetes mellitus ("DM") "is a chronic condition characterized by high blood glucose levels that result from the body's inability to produce or use insulin." Social Security Ruling, SSR 14–2p; Titles II and XVI: Evaluating Diabetes Mellitus, 79 Fed. Reg. 31,375, p. 31,376 (June 2, 2014).  In Type 1 DM, "the pancreas does not produce insulin due to an autoimmune destruction of the insulin-producing cells." *Id.*  As a result, "[p]eople with Type 1 DM must take daily insulin to live." *Id.*  Daily management of DM requires frequent checking of blood glucose levels to evaluate the

level of insulin that must be administered. *Id.* "For each insulin dose, the decision regarding the amount and type of insulin the person needs is based on: Current blood glucose level (high, normal, or low); knowledge of the timing and type(s) of insulin the person had earlier in the day; the amount of food the person expects to consume; and the nature of activities the person planned for the next several hours." *Id.* Proper management of DM therefore requires a certain level of cognitive capacity and functioning on the part of the diabetic individual. *See id.* at 31,378 (describing the cognitive capacity required for children to assist in managing their condition).

Although there is no longer a specific listing for evaluating diabetes mellitus within the regulations, the Social Security Administration has stated that it "would continue to recognize DM as a potential cause of disability." *Id.* at 31,375-31,376. In order to evaluate the severity of DM, the SSA states that it will "consider any symptoms, such as fatigue or pain, that could limit functioning. If the effects of DM, alone or in combination with another impairment(s), significantly limit an adult's physical or mental ability to do basic work activities, we find that the impairment(s) is severe." *Id.* at 31,377. The Social Security Administration also acknowledges that "[t]he combined effects of DM and another impairment(s) can be greater than the effects of each of the impairments considered separately. We consider all work-related physical and mental limitations, whether due to an adult's DM, other impairment(s), or combination of impairments. For example, … [a]dults with chronic hyperglycemia may experience fatigue or difficulty with concentration that interferes with their ability to perform work

11

activity on a sustained basis." *Id.* at 31,378. This revised regulation specifically identifies examples of the effects of DM and the body systems under which the SSA will evaluate them to determine whether the impairment meets or medically equals a listing. *Id.* The list includes cognitive impairments, depression, and anxiety, which are evaluated under the mental disorders listings (12.00). *Id.* Accordingly, a proper analysis of this impairment by the ALJ must include a consideration of Plaintiff's diabetes in combination with his other identified impairments, in this case, autism spectrum disorder and depression. The Court is unable to conclude, based upon this record, that the requisite analysis was properly done.

First, the ALJ appears to have discounted relevant medical evidence both from before Plaintiff's alleged onset date and after his last insured date simply because it was outside of the narrow four-month time range, then relied upon the resulting evidentiary gap to find that his diabetes was not severe. This was error. *See Karen S. v. Comm'r of Soc. Sec.*, 2022 WL 462086 at *9 (N.D.N.Y. Feb. 15, 2022) (quoting *Carter v. Comm'r of Soc. Sec.*, 2015 WL 8029511, at *4 (N.D.N.Y. Nov. 12, 2015), *report and recommendation adopted*, 2015 WL 8180368 (N.D.N.Y. Dec. 7, 2015) ("Although the relevant period for the ALJ's disability determination is before the plaintiff's date last insured, 'medical evidence obtained after a plaintiff's date last insured can be used to show that plaintiff was disabled prior to her date last insured[]' as long as it pertains to already-existing impairments."). In contrast to the ALJ's assertion that "there was no evidence of relevant treatment or complaints in the period at issue," Tr. at p. 18, the

record repeatedly describes Plaintiff's difficulties in managing his condition, both before and after the relevant four-month span in 2014. For instance, his diabetes was repeatedly assessed as "uncontrolled," his insight into his condition was often assessed as "fair," and providers frequently noted that his mental health conditions caused a barrier to his care. *See, e.g.*, Tr. at pp. 287, 305, 538, 552. Moreover, some of the same treatment notes that the ALJ relies upon to discount the severity of Plaintiff's condition actually support Plaintiff's position when read in full. For example, the ALJ points to a statement from January 2015 treatment notes by Dr. Pastore that Plaintiff denied symptoms and reported he checked his blood glucose three times a day on "most days." Tr. at p. 18 (citing to Tr. at pp. 552-554). Defendant asserts that "[a] reasonable mind could infer from Dr. Pastore's report that Plaintiff denied diabetes symptoms in January 2015 that he, in fact, had no such symptoms at that time." Def.'s Mem. of Law at p. 17. However, those same notes also state that Plaintiff's last diabetic ketoacidosis episode was in August of 2014 (less than five months prior, and only about a month after his date last insured), continue to assess his DM as uncontrolled, and lists additional hospitalizations for ketoacidosis in December 2009, July 2010, and July 2013. Tr at. p. 553. Notably, at the hearing, ALJ Penn appears to have acknowledged the generally uncontrolled nature of his diabetes, inquiring: "And what about with your diabetes. You develop diabetic ketoacidosis essentially once a month for many, many years and the physicians are all indicating it's because you forget to take your medications? A: Yes, that is indeed

correct. I do have a bit of trouble with that."   Tr. at p. 51.   The Social Security

Regulations explain that diabetic ketoacidosis ("DKA")

> is an acute complication of hyperglycemia and is potentially
> life-threatening. It is not uncommon for people with Type 1
> DM to initially present with DKA. DKA occurs when there
> is a shortage of insulin, resulting in toxicity in the blood.
> DKA may result in dehydration and an altered metabolic
> state with potential neurological, renal, respiratory, or
> cardiac dysfunction(s). When not appropriately treated,
> DKA may lead to chronic neurocognitive changes, coma, or
> even death.

SSR 14-2P.  The same SSR describes that hyperglycemia, or high blood glucose,

> means a person does not have enough insulin in his or her
> body. It can occur when a person does not take his or her
> insulin, eats too much, or does not exercise enough. It can
> also occur when a person is sick or under stress. Symptoms
> of hyperglycemia include frequent urination, increased
> thirst, blurred vision, headaches, difficulty concentrating,
> abdominal pain or nausea, and "fruity-smelling" breath.

*Id.*

Although the ALJ is correct that there is little medical evidence specifically dated within

the four-month window, there is evidence both before and after which the ALJ does not

appear to have grappled with in concluding that Plaintiff's diabetes was not severe.

In November 2013, just three months before his alleged onset date, Plaintiff was

evaluated by a counselor at Psychological HealthCare, P.L.L.C.  Tr. at p. 305.  The

intake diagnostic form indicated that Plaintiff had been referred by his primary care

doctor, Dr. Pastore, due to trouble managing his diabetes.  *Id.*  His self-care functioning

levels related to his activities of daily living were assessed as "fair" and individual

psychotherapy was recommended on a weekly basis to improve his ability for self-care. Tr. at pp. 305, 309.  Similarly, a report from July 10, 2014 by licensed psychologist Niamh Doyle, Ph.D., indicated that Plaintiff was evaluated on May 8, 2014, and July 4, 2014, after a referral from his primary care physician.  Tr. at p. 287.  The report was dated only ten days after Plaintiff's date last insured and was based upon an evaluation performed during the relevant period.  *See* Tr. at p. 16, 287.  The diagnostic evaluation was completed to assess Plaintiff for the presence of autism spectrum disorder in response to his continued difficulties managing his condition.  Tr. at p. 286.  The report referenced the difficulty Plaintiff experienced in managing his diabetes and noted that he had experienced diabetic ketoacidosis on "multiple occasions because of a failure to monitor his blood sugar levels."  Tr. at p. 287.

While the ALJ is certainly correct that there is more record evidence to show worsening of the condition after Plaintiff's date last insured, the Court is unable to ascertain how the ALJ determined that Plaintiff's diabetes could not be severe until episodes of life-threatening diabetic ketoacidosis occurred on a monthly, or sometimes weekly, basis.  Again, the Court notes that evidence from after the date last insured can be relevant to show the continuity and severity of an already-existing impairment. *Karen S. v. Comm'r of Soc. Sec.*, 2022 WL 462086 at *9.  To that end, the Court notes that treatment notes from May 2015, like those from January 2015, continue to describe Plaintiff's diabetes as "uncontrolled."  Tr. at pp. 552, 538.  Dr. Pastore's May 7, 2015 treatment notes list approximately seven hospitalizations for diabetic ketoacidosis.  Tr.

at p. 539.  Dr. Pastore referred Plaintiff to the Joslin Endocrine Clinic for uncontrolled type 1 diabetes mellitus in 2017.  Tr. at p. 2033.  Treatment notes from his evaluation note a history of uncontrolled type-1 diabetes with complications, hypoglycemia unawareness, depression with anxiety, and psychological factors affecting type 1 diabetes mellitus.  *Id.*  Those records note hemoglobin A1C records from May 2015 through July 2017, all of which were higher than Plaintiff's target range.  *See* Tr. at p. 2040 (listing lab values from 5/17/2015, 10/15/2015, 12/2/2015, 4/22/201, 6/7/2016, 8/11/2016, 11/29/2016, 2/28/2017, 7/11/2017).  Medical records from April 2018 describe A1C values from 10/13/2017 and 04/13/2018 as high and note the presence of a large amount of ketones in Plaintiff's urine.  Tr. at pp. 2062-2064.  A "CMP suggested the patient was becoming acidotic" and Plaintiff was advised to go to the emergency department.  Tr. at p. 2064.  Notes from July 30, 2017 indicate that Plaintiff was admitted to the emergency department, and subsequently transferred to the intensive care unit for diabetic ketoacidosis.  Tr. at pp. 2071-2072.  Hospital notes from a March 2018 admission for diabetic ketoacidosis note that Plaintiff "is frequently here with DKA, most recently discharged in February of 2018."  Tr. at p. 1319.  July 2017 hospital notes describe Plaintiff as "critically ill" during an admission for severe diabetic ketoacidosis and identify an acute kidney injury.  Tr. at p. 1525.  April 2018 treatment notes from Dr. Pastore discuss a follow up appointment after a hospitalization for DKA.  Tr. at pp. 454-457.  Some of these notes describe Plaintiff's lack of judgment and insight, while also

identifying four hospital admissions for DKA in 3 months, along with acute kidney failure. *Id.*

Although an error at step two may sometimes be deemed harmless, the Court cannot conclude that this is the case here because it is not clear from the ALJ's decision that she considered any of the functional effects of Plaintiff's diabetes at subsequent steps of the sequential evaluation. *See Trombley v. Berryhill*, 2019 WL 1198354, at *6 (W.D.N.Y. Mar. 14, 2019); *Snyder v. Colvin*, 2014 WL 3107962, at *5, n. 12 (N.D.N.Y. July 8, 2014) ("It is important to note that the mere fact that sequential evaluation proceeds beyond Step 2, does not, *ipso facto*, render a Step 2 error harmless. This harmless error construct is valid only when administrative law judges faithfully execute their responsibilities to consider *functional effects* of all impairments in subsequent steps.") (emphasis in original)).  Given that there were no apparent limitations included in the RFC related to Plaintiff's diabetes, the Court cannot consider this error to be harmless.

Second, the ALJ's severity determination appears to be based upon an improper assessment of the relationship between Plaintiff's mental health impairments and his diabetes.  The record is replete with evidence from Plaintiff's treating providers that his inability to manage his diabetes stemmed from his mental health impairments. *See, e.g.*, Tr. at pp. 305, 553, 2047, 2121.  Nevertheless, the ALJ found that Plaintiff would have only a moderate limitation in his functional ability to adapt or manage himself, stating that "[t]here was mention of the claimant's impairments possibly limiting his ability to

17

properly care for his diabetes, but this was not documented in the relevant period (Exs. 1F, 4F, 5F)." Tr. at pp. 20-21. ALJ Penn asserts that Plaintiff had only "mild depression and cognitive dysfunction," pointing to November 2013 treatment notes which rate Plaintiff's symptoms of depression as a 3 out of 10, and his cognitive dysfunction as a 3 out of 10. Tr. at pp. 21, 306. Those same notes indicate that the reason Plaintiff had been referred for psychological treatment was at least in part due to the difficulty he experienced managing his diabetes. As SSR 14-2P explicitly states, "[t]he combined effects of DM and another impairment(s) can be greater than the effects of each of the impairments considered separately." This demonstrates why it is critical for these impairments to be assessed in combination rather than solely on an individual basis. The ALJ went on to state that "[b]etween February 2014 and April 2014, the claimant had only routine behavioral health follow ups." Tr. at p. 23. However, during that time the record shows that Plaintiff was in fact attending individual psychotherapy either weekly or biweekly in an effort to address his self-care issues. *See, e.g.*, Tr. at pp. 299-293. Those same notes indicate that Plaintiff "tends to blame his mother for his diabetes issues rather than assume responsibility for [him]self." Tr. at p. 301.

Finally, the Court finds that the ALJ erred in the evaluation of the statement provided by Plaintiff's treating primary care physician, Paolo Pastore, M.D. In addition to the notations throughout the record that Dr. Pastore had referred Plaintiff to various mental health sources for evaluations and treatment, Dr. Pastore also provided an opinion in the record dated February 19, 2020. Tr. at p. 562. Dr. Pastore opined that

Plaintiff "has struggled for many years to get his health under control," with a large part of the struggle "directly related to his Autism and associated mental health issues." Tr. at p. 562. The opinion goes on to state that Plaintiff "is learning disabled and has difficulty with emotional self-regulation" and "requires significant help from his mother." *Id.* Dr. Pastore notes that Plaintiff's strained relationship with his mother, however, "makes it increasingly difficult for him to remain compliant with treatments." *Id.* This opinion describes the interplay between Plaintiff's mental health conditions and his ability to care for his diabetes that is well-documented throughout the record. The ALJ found Dr. Pastore's opinion "generally less persuasive" based, at least in part, upon the fact that the statement was written "almost six years after the claimant's date last insured." Tr. at p. 24. While it is true that there was no specific statement of limitation for the "relevant period at issue," Dr. Pastore has been treating with Plaintiff since before the relevant period and has been responsible for most, if not all, of the referrals to diabetes and mental health specialists. *See, e.g.*, Tr. at p. 305 (November 25, 2013 treatment notes stating that Plaintiff had been referred by Dr. Pastore). While the ALJ generally acknowledged the existence of the treating relationship, she appears to have discounted Plaintiff's assertion that Dr. Pastore treated him during the relevant period. *See* Tr. at p. 24 ("While the claimant testified that Dr. Pastore had treated him during the relevant period, the record does not contain any evidence of treatment with Dr. Pastore in the period at issue, other than a normal chest x-ray from June 2014 (Ex. 4F/154)."). As a result, it is unclear how the ALJ determined that the statement was

"unsupported by treatment notes from the period at issue and [] inconsistent with the mild to moderate symptoms reported in the claimant's mental health treatment in the relevant period." Tr. at p. 24.   To the extent that Dr. Pastore's opinion was unclear regarding the time period it covered, the ALJ should have recontacted him to provide clarification given the relatively little additional evidence available from this time period.   Although the Court recognizes that an ALJ's duty to develop the record is not unlimited, it is implicated where, as here, there is otherwise insufficient evidence to support the decision.   *C.f. Zawistowski v. Comm'r of Soc. Sec.*, 2020 WL 1530857 (W.D.N.Y. Mar. 31, 2020) (discussing the ALJ's duty to develop the record, albeit in the context of the previous treating physician rule).

Accordingly, the Court finds that remand is warranted for the ALJ to properly consider all the evidence of record, to formulate a new Step Two severity determination based upon that evidence, and to further develop the record if it is deemed incomplete. The Court therefore declines to address Plaintiff's final claim of error related to the RFC determination, given that the ALJ will need to formulate a new RFC upon remand.

## IV. CONCLUSION

**ACCORDINGLY**, it is

**ORDERED**, that Plaintiff's Motion for Judgment on the Pleadings is **GRANTED**; and it is further

**ORDERED**, that Defendant's Motion for Judgment on the Pleadings is **DENIED**; and it is further

**ORDERED**, that Defendant's decision denying Plaintiff disability benefits is **REVERSED** and the case is **REMANDED** pursuant to section four for further proceedings; and it is further

**ORDERED,** that the Clerk of the Court shall serve copies of this Memorandum-Decision and Order on the parties.

Dated: August 26, 2022
      Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

21